UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT SCOTT FEAMSTER,<br><br>  Plaintiff,<br><br>  v.<br><br>GACO WESTERN, LLC,<br><br>  Defendant. | Case No. 18-cv-01327-HSG<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |

Plaintiff Robert Scott Feamster, now proceeding pro se, initially brought a putative class action against Defendant Gaco Western, LLC, alleging that Defendant's spray polyurethane foam, which had been installed in Plaintiff's house, was defective. *See* Dkt. No. 1 ("Compl.").[1] Plaintiff brought causes of action for violations of California's Consumers Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL") as well as seven common law claims. *See id*. The Court granted Defendant's motion to deny class certification. *See* Dkt. No. 95. The parties waived their demand for a jury trial, *see* Dkt. Nos. 168, 169, and the Court held a bench trial on May 19 and 20,

---

[1] Over the course of this case, three separate law firms sought, and were granted, permission to withdraw from representing Plaintiff. *See* Dkt. Nos. 56, 62, 137, 142. Plaintiff's first counsel represented that "it has become unreasonably difficult for me to carry out my representation of Mr. Feamster effectively." Dkt. No. 56-1 at 2. Over two years later, Plaintiff's second group of counsel sought to withdraw roughly three months after entering an appearance. Dkt. No. 133. Counsel represented that "[s]hortly after entering the case as counsel various issues arose that created irreconcilable differences between plaintiff and current counsel," and that "[s]ince late July, 2021 to the present, I informed Mr. Feamster of various issues that create irreconcilable differences between us and that the Rules of Ethical Conduct prevented my further representation of him in this matter." Dkt. No. 137 at 4; Dkt. No. 137-1 at 3. Plaintiff thus represented himself at the bench trial and during the bulk of the discovery period.

1  2022, *see* Dkt. Nos. 198, 199.  The following constitutes the Court's Findings of Fact and
2  Conclusions of Law under FRCP 52(a).[2]

### **Findings of Fact**[3]

1.  In November 2015, Performance Foam Tech installed Gaco OnePass spray polyurethane foam insulation, also known as F1850, at Plaintiff's home.  Ex. 574; Ex. 500 (Transcript of Deposition of Thomas Sojak) at 178–79, 302;[4] Ex. 524; Trial Transcript Excerpts, Volume I at 9:16–10:10, 11:11–19, 12:9–15.

2.  Michael Morgan was the owner of Performance Foam Tech at the time.  Ex. 500 at 302; Trial Transcript Excerpts, Volume I at 9:16–10:10.

3.  Performance Foam Tech was hired for the project by Greg Vickerman, Plaintiff's general contractor overseeing the remodeling of his home.  Trial Transcript Excerpts, Volume I at 9:12–13; 10:13–18.

4.  At least some of the foam installed at Plaintiff's home came from lot number W15K0382.  Ex. 575 (internal Gaco email chain referencing three batch numbers including W15K0382, with Dan Nelson, Gaco Western VP, Research and Development confirming that "The K lot number is the same one that failed at Feamster residence.").

---

[2] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.  Although the Court initially planned to direct the parties to submit proposed findings of fact and conclusions of law, the Court has concluded based on how the case has gone that those submissions would not be helpful, and that oral argument is unnecessary.  The Court's findings and conclusions are based on the testimony offered and exhibits admitted at trial, with which the Court is very familiar.

[3] Many of the documents introduced by Plaintiff at the bench trial include statements or summaries by Plaintiff himself.  *See*, *e.g.*, Ex. 578 (long email from Plaintiff to Gaco employees and others recounting Plaintiff's view of events).  As the Court explained at the trial, Plaintiff's own out-of-court statements are hearsay when offered by him and cannot be considered for their truth.  The Court thus considers such statements only as evidence of what was communicated to Defendant, and not as substantive evidence of the truth of the matters asserted.  Fed. R. Evid. 801(c).

[4] Even though this case has been pending for years, the parties conducted no depositions during the discovery period.  *See* Dkt. Nos. 187, 190.  The Court thus reopened discovery shortly before trial to accommodate depositions of Plaintiff and one defense witness, former employee Thomas Sojak.  *See* Dkt. No. 186.  Sojak's deposition transcript was admitted at trial as Exhibit 500.  Plaintiff failed to timely disclose his trial witnesses, and Sojak was not within the Court's subpoena power, so Plaintiff was the only live witness at trial.  *See* Dkt. Nos. 190, 194.

5.        Presumably Performance Foam Tech, not Plaintiff, purchased the installation materials from Defendant. Plaintiff did not present any evidence suggesting that he bought the foam directly from Defendant or that he signed a contract with Defendant.[5]

6.        Around March 2016, Vickerman told Plaintiff he noticed problems with the foam. Trial Transcript Excerpts, Volume I at 14:4–14. In March or April, Vickerman and Morgan pointed out issues with the foam in the crawl space. *Id.* 16:11–22, 19:4–17. There were cracks and places where the foam was pulling away from the wood, and there were splits and gaps in the foam. *Id.* 17:21–19:17. The splitting got progressively worse over time. *Id.* 21:12–22:6; *see also* Feamster Evidence Photos.[6]

7.        Sometime between March and April 2016, Morgan reported the problem to Gaco. *Id.* 15:8–11, 20:13–20.

8.        In mid to late April 2016, Gaco employees Craig McCalla and Craig Messer came to Plaintiff's house to look at the issues with the foam. Trial Transcript Excerpts, Volume I at 26:22–27:11. McCalla was an Area Manager covering several western states, part of California, and parts of Canada, and Messer was in the "Technical Service Wall Foam Division." Exs. 551 (McCalla email signature block describing him as "PNW Area Manager" and listing covered territory), 549 (Messer email signature block), 500 at 299–300 (testimony by Sojak noting that "[w]e already had two people at your house" and that "[w]e had our area manager and our tech rep on the job"). According to Plaintiff, the Gaco employees suggested that the issue was an "installer problem" or the "temperature was wrong," which Vickerman disputed. Trial Transcript Excerpts, Volume I at 27:16–18. McCalla or Messer said that the issues were unusual. *Id.* 30:1–6. The Gaco employees said they would get back to Plaintiff. *Id.* 29:8–13. They prepared a written report and a verbal report, but Plaintiff never received either report. Ex. 500 at 300; Trial Transcript Excerpts, Volume I at 29:10–18.

---

[5] The portion of Plaintiff's trial testimony discussing this issue is not part of the final excerpts the Court asked the Court Reporter to prepare, so this finding is based on the Court's recollection of the testimony and evidence presented at trial.

[6] Photos of the foam and damage to Plaintiff's home were admitted in evidence by stipulation. *See* Dkt. No. 208.

3

9. On April 22, 2016, McCalla sent an email to a group of Gaco employees, including Sojak and Messer, regarding "Performance Foam Tech." Ex. 546. McCalla asked whether "any of the below batch numbers have any reported issues," but the version of the email admitted in evidence does not list any batch numbers. McCalla said "[c]ustomer called with shrinking 1850 months later," noted that the project was "[s]prayed last November," and attached pictures (also not included in the version admitted in evidence). *Id.* at LIT 001327.[7] McCalla said "[t]his is the 3rd shrinkage issue I have had with material being sprayed in the month of November," including from Performance Foam Tech, described as being a "contractor in the Bay area of CA." *Id.* at LIT 001328. McCalla said "I'm getting nervous," and noted that he had lost a customer in the Spokane, Washington area due to this issue. *Id.* McCalla said "Little Craig & I will be down there next week to review." *Id.* at LIT 001327. The Court infers that "Little Craig" is Craig Messer, and that the "will be down there" reference is to the inspection of Plaintiff's house described above. Kamm asked "[w]hich lot numbers?" a few days later, but McCalla's response does not reflect them. He asked "[a]ny word yet?," and Kamm's response is cut off in the exhibit. *Id.*

10. In an internal email exchange starting on May 5 and continuing through May 11, 2016, Messer, McCalla and other Gaco employees discussed "Foam Samples from Performance foam tech," the company that installed Plaintiff's foam. Ex. 548. The emails discuss a "job . . . in California, [a]n area not known for cold temps," in "an attic of a finished home." *Id.* at LIT 001128. When Chantel Kamm, Quality Manager, suggested based on the sample analysis that "it looks like this may have been pass thickness, or perhaps ambient or substrate moisture," McCalla responded "I don't buy any of that." *Id.* at LIT 001127–001128. McCalla explained "I'm going to guess this is either a mixing issue or a raw issue." *Id.* Messer then responded "Ok we have had a number of problems with 1850. This is a problem with the batch." *Id.* at LIT 001127. Messer said "I believe this is a chemical issue for sure," and opined "[t]his isn't the contractor[']s problem." *Id.* Jim Dumar responded that "[f]rom the lot number it is probably during the mixing

---

[7] As detailed earlier, the foam installation at Plaintiff's home took place in November 2015.

problems," and opined that "[t]he odds of it being a raw material issue are low." *Id.* at LIT 001126. Later in the chain, Dumar said "I just talked to Chantel and it appears of the two lots one was before the mixing was resolved, one after," which "could help explain the different results." *Id.* Dumar said it "look[ed] like it was a 50:50 mix of the two lots." *Id.*

11. In what appears to be a continuation of this same thread on May 11, 2016, Messer notes in response to an email from Dumar (which is cut off in the exhibit) that "[i]t was just some areas scattered around the house so far but I'm sure it's not over yet." Ex. 549. Dumar responded "That supports the good lot/bad lot theory," and noted that "[w]e do not currently have any way to tell if a particular sample is off ratio or from a bad mix." *Id.* Dumar's email concluded "Ok, so in summary, since there was not excess moisture present the shrinkage is most likely due to inconsistent mixing in the early lot. I still think the thicker pass exasperated [sic] the problem, but probably wouldn't have mattered if the batch had been correct." *Id.*

12. On May 23, 2016, McCalla emailed Sojak about "Scott Feamster Residence." Ex. 551. At the time, Sojak's title was "VP Sales Gaco WallFoam." *Id.* McCalla's email was in response to Sojak's May 13 email asking McCalla to "find out if we can ship him material to pay for the repair." *Id.* McCalla told Sojak that "Michael" (who the Court infers, given the context, was Mr. Morgan) "wants to be paid as if it were an actual new job, even though it is a foam failure repair." *Id.* McCalla said he "tried to convince [Morgan] to take the 4+ sets of material," but "[h]e declined." *Id.* McCalla said "[p]er Chantel/Jim, only 6 sets of material were affected." *Id.*

13. In another internal email exchange starting on June 1 at the latest and continuing through June 3, 2016, Gaco personnel discussed a forwarded email concerning "Foam samples from Performance foam tech." Ex. 554.[8] The capitalization in the subject line is the same as in the earlier exchange reflected in Exhibit 548, which happened between May 5 and May 11, and the chain builds on Dumar's May 11 "good lot/bad lot theory" email that was part of Exhibit 549.

---

[8] Like many of the email chains introduced by Plaintiff at trial, this exhibit does not contain the complete exchange. Based on the Bates numbers of Exhibits 554 (LIT 001437) and 550 (LIT 001438), and the fact that the June 1, 2016 email is from Tim Novacek and the email signature at Bates LIT 001438 reads "Thanks, Tim," the Court concludes that these two exhibits together are part of the same exchange.

1  On June 1, Tim Novacek emailed McCalla that "[o]verall, it looks like we shipped Performance Foam Tech 6 sets of 1850 batch W15K0034 (material manufactured before they improved mixing process)."[9]  *Id*. at LIT 001437.  Jessica Godfoy, Customer Service Representative, then said on June 3 that "Michael just called to order 4 sets of material."  *Id.*  The Court infers that this again was Michael Morgan, given the earlier chain involving "Michael," replacement sets, and the Feamster residence.  Later on June 3, Godfroy emailed Sojak "I just spoke with Craig over the phone and he would like to go ahead and give this customer the 4 sets.  Can I get your approval to the send [sic] the 4 sets at no charge to Performance foam tech."  *Id.*

14. On June 2, 2016, Gaco personnel, including Mr. Sojak, participated in a conference call with Plaintiff and his contractor Mr. Vickerman, Cathy Haire (who had installed Plaintiff's HVAC system), and likely Mr. Morgan from Performance Foam Tech.  Trial Transcript Excerpts, Volume II at 10:14-11:10, 12:18-13:17.[10]  The discussion concerned the problems with the foam, as well as what repairing it would entail.  *Id.* at 11:22–13:1.

15. Later on June 2, 2016, McCalla emailed Sojak about the "Feamster residence."  Ex. 553.  McCalla said that "Michael," who the Court infers was Morgan given the context, "told me that they want him to cut with a sawzall down thru the middle of the rafter bay to relieve any stresses in the foam prior to him spraying."[11]  McCalla said "I personally think that is a good idea."  *Id.*

---

[9] A March 27, 2018 internal Gaco email says that "[w]e are working currently to identify and resolve several issues with the 1850 product that was produced in 2015 for which we have incurred costs to fix in the field."  Ex. 540.  The email conveys a request for "test data for the 32 batches that we have identified that seem to have the issues."  *Id.*  Batch number W15K0034 is one of the listed batches.  *Id.*

[10] A June 6, 2016 internal Gaco email refers to "last Thursday's conference call," and says that Plaintiff was "looking for the 'meeting minutes'" from the call.  Ex. 555.  June 6, 2016 was a Monday, so the Court infers that the call happened on Thursday, June 2.  This conclusion is corroborated by an undated note, potentially from a calendar program, listing Todd Schroeder as the "Owner" and reading "At least 12 calls from Michael on Wednesday about Feamster residence.  Exhausting.  Conference call scheduled for Thursday AM."  Ex. 545.

[11] The Court takes judicial notice that "Sawzall" is a brand name for a reciprocating saw.  Sawzall® Reciprocating Saws, Milwaukee Tools, https://www.milwaukeetool.com/Products/Power-Tools/SAWZALL-Reciprocating-Saws

16.     Plaintiff testified that he recalled that Morgan said someone at Gaco recommended that he slice the foam to relieve stress in it, and recalled Morgan slicing the foam (accompanied by Plaintiff and Vickerman) in "roughly May," before the June 2 conference call, Trial Transcript Excerpts, Volume I at 32:12–36:4, but the evidence suggests this happened after the call.

17.     On June 7, 2016, in response to McCalla's June 6 email regarding "Performance foam tech/Scott Feamster" that referenced "meeting minutes," Sojak emailed McCalla "Thought we left the meeting with the following:

- HVAC contractor would send in her revised proposal for approval, gave her the verbal approval for $24,000.
- You were going to finalize the numbers with Michael for his portion.
- GC had some minor work to do in removing and replacing some knee walls.

What did I miss?"

McCalla responded "Nothing that I remember. Michael[']s numbers are coming as he had to cut each bay to relieve stress." Ex. 556.

18.     On June 20, 2016, McCalla emailed Sojak and others stating that "the foam contractor has come up with a fix that will be less painful for all, including the homeowner." Ex. 579. Sojak testified that Morgan recommended spraying over the existing foam, which Sojak thought made sense, but Plaintiff declined to proceed with that fix based on his general contractor's advice. Ex. 500 at 296:2–297:25.[12]

19.     On July 11, 2016, Plaintiff's counsel sent an email to Sojak and Dan Nelson, Gaco's VP, Research and Development, providing notice of a claim under the California Consumer Legal Remedies Act. Ex. 576.

20.     On July 14, 2016, Sojak sent an email to Nelson and other Gaco personnel titled "Questions regarding the Feamster residence." Ex. 574. One question was "What, if anything, was done with any OnePass inventory produced during the problem period?," and one bullet point

---

[12] In a July 18, 2016 email to Sojak about a "OnePass application issue" in Kansas involving the same lot that failed at the Feamster residence, Nelson, the Research and Development VP, said "I would not spray over shrinking foam—suggest tearing it out." Ex. 575.

in the answer read "Material was quarantined, remixed followed by extensive QC follow up." Another question was "Did all or most of the OnePass product produced during the problem period fail or was failure unpredictable?" The answer to that question was "Failure was unpredictable have probably fixed 15 to 20 jobs from the fall." Another question was "Regarding the Feamster residence, did the product completely fail to bond or was the bonding inconsistent, with some good and some bad?" The answer was "Some good and some bad pictures are available from the job visit."

21. Gaco appears to have established a $1.37 million reserve to cover claims based on problems with the 1850 foam product. *See* Ex. 541 (internal April 16, 2018 email chain noting that once invoices for "approved ongoing jobs from WeatherTight" were paid, "we are still under $1,370,000 limit," and referencing "our $1.37M cap"); Ex. 543 (internal May 15, 2018 email chain referencing "an updated schedule of the total 1850 claims paid since inception and the claims paid since the acquisition date," and noting that "[b]ased on the claims recently paid we have effectively used up all of the reserve established as part of the purchase").[13]

22. Plaintiff introduced several communications regarding settlement offers and negotiations with Gaco in this case. Federal Rule of Evidence 408 provides that evidence of "conduct or a statement made during compromise negotiations about the claim" to prove or disprove the validity or amount of a disputed claim is inadmissible. Rule 408 does not bar such evidence when offered for another purpose. *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007). The Court has not considered any of the communications that fall under Rule 408 as evidence of the validity or amount of Plaintiff's claim. *See* Exs. 559, 561–63, 571, 578.

//
//
//

---

[13] On April 3, 2017, Firestone Building Products announced that it had acquired Gaco Western. *See* https://gaco.com/2017/04/firestone-building-products-acquires-gaco-western (April 3, 2017 Gaco press release).

**Conclusions of Law**

1. Plaintiff alleges that Defendant violated the CLRA and the UCL and also brings causes of action for breach of express warranty; breach of the implied warranty of merchantability; negligence; strict products liability; unjust enrichment; fraudulent misrepresentation, concealment, and failure to disclose; and negligent misrepresentation. *See* Compl. ¶¶ 34–102.

2. To prevail on his CLRA claim, Plaintiff must prove that (i) he acquired, or sought to acquire, by purchase or lease, Gaco Western foam for personal, family, or household purposes; (ii) Defendant engaged in one or more prohibited practices from Civ. Code § 1770(a); (iii) Plaintiff was harmed; and (iv) Plaintiff's harm resulted from Defendant's conduct. *See* California Civil Jury Instructions ("CACI") No. 4700.

3. Plaintiff alleges that Defendant engaged in the following prohibited practices:
    a. Misrepresented the "source, sponsorship, approval, or certification" of Gaco Western foam, Civ. Code § 1770(a)(2);
    b. Represented that Gaco Western foam has "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which [it] does not have," Civ. Code § 1770(a)(5);
    c. Represented that Gaco Western foam is "of a particular standard, quality, or grade" when it is of another, Civ. Code § 1770(a)(7);
    d. Represented "that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," Civ. Code § 1770(a)(14); and
    e. Represented "that the subject of a transaction has been supplied in accordance with a previous representation," Civ. Code § 1770(a)(16).

Compl. ¶ 41.

4. Plaintiff's harm resulted from Defendant's conduct if Plaintiff relied on Defendant's representation. To prove reliance, Plaintiff need only prove that the representation was a substantial factor in his decision. Plaintiff does not need to prove that it was the primary factor or the only factor in the decision. If Defendant's representation of fact was material,

reliance may be inferred. A fact is material if a reasonable consumer would consider it important in deciding whether to buy or lease the goods. *See* CACI No. 4700.

5. The Court finds Defendant not liable on Plaintiff's CLRA claim because there is no evidence that Plaintiff relied on any representations or omissions by Defendant before the sale of the foam. *See Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1200 (N.D. Cal. 2014) (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010)). Performance Foam Tech, the company hired by Plaintiff's general contractor, apparently purchased the foam. There is no evidence that Plaintiff was exposed to, let alone relied on, any specific representations about the foam before it was purchased and installed by Performance Foam Tech, or that Plaintiff was involved in the purchase in any way.

6. The UCL prohibits business acts or practices that are (1) fraudulent, (2) unfair, or (3) unlawful. *See* Cal. Bus. & Prof. Code § 17200. To have standing, Plaintiff must show that he "suffered injury in fact and has lost money or property" as the result of the fraudulent, unfair, or unlawful practice. *Id.* § 17204. Under the UCL's "fraudulent" prong, Plaintiff must show that Defendant's conduct is "likely to deceive" a "reasonable consumer." *See Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing California law). The "unlawful" prong of the UCL borrows violations of other laws, meaning a "[v]iolation of almost any federal, state, or local law may serve as the basis for a UCL claim." *Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008).

7. Plaintiff alleges that Defendants' conduct in manufacturing, designing, engineering, fabricating, assembling, constructing, testing, examining, distributing, and/or marketing the defective Gaco Western foam, as well as its violation of the CLRA and common law, was an unfair, unlawful, or fraudulent business practice under Cal. Bus. & Prof. Code § 17200. *See* Compl. ¶ 46.

8. The Court finds Defendant not liable on Plaintiff's UCL claim. First, Plaintiff must show actual reliance for any claims based on misrepresentations and deception, whether under the "fraudulent" prong or otherwise. *Pratt v. Whole Food Mkt. California, Inc.*, No. 5:12-CV-05652-EJD, 2015 WL 5770799, at *4–5 (N.D. Cal. Sept. 30, 2015). He has not as explained above: there

1   is no evidence that Plaintiff was exposed to any representations by Defendant.  As to Plaintiff's

2   allegations regarding fabrication, assembly, construction, testing, examination, and distribution,

3   Plaintiff has provided no evidence of an unfair or unlawful practice.  At most, Plaintiff has

4   established that the foam installed in his home was defective, which is not enough to give rise to a

5   UCL claim.  *See, e.g.*, *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1161, 1163 (N.D.

6   Cal. 2011); *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965, 969 (1997) ("In our view the

7   unintentional distribution of a defective product is beyond the scope and policy of the 'unlawful'

8   prong of section 17200").

9       9.      To prevail on a claim for breach of express warranty, Plaintiff must prove that (i)

10  Defendant gave Plaintiff a written warranty or description of or made a statement of fact or

11  promise about Gaco Western foam; (ii) the Gaco Western foam did not perform as stated or

12  promised; (iii) Plaintiff took reasonable steps to notify Defendant within a reasonable time that the

13  Gaco Western foam was not as represented, whether or not Defendant received such notice; (iv)

14  Defendant failed to repair the Gaco Western foam as required by the warranty; (v) Plaintiff was

15  harmed; and (vi) the failure of the Gaco Western foam to be as represented was a substantial factor

16  in causing Plaintiff's harm.  *See* CACI No. 1230.

17      10.     Formal words such as "warranty" or "guarantee" are not required to create a

18  warranty.  It is also not necessary for Defendant to have specifically intended to create a warranty.

19  But a warranty is not created if Defendant simply stated the value of the goods or only gave its

20  opinion or recommendation regarding the goods.  *See id.*

21      11.     Plaintiff alleges that Defendant breached its warranty because Gaco Western foam

22  did not perform its basic intended and essential function, and that Plaintiff failed to adequately

23  repair or replace the foam after Plaintiff notified Defendant.  *See* Compl. ¶¶ 50–57.

24      12.     The Court finds that Defendant is not liable on Plaintiff's claim for breach of

25  express warranty.  Again, Plaintiff did not provide evidence that he was exposed to *any*

26  information about the foam, let alone that he received a warranty, promise, or statement of fact

27  about the foam prior to the sale that could be construed as an express warranty.  *Cf. Greenman v.*

28  *Yuba Power Prod., Inc.*, 59 Cal. 2d 57, 60 (1963) (finding a jury could reasonably conclude that

11

1  statements in a manufacturer's brochure, which plaintiff "studied" before purchasing a power tool,
2  constituted express warranties).

3        13.     To prevail on a claim for breach of implied warranty of merchantability, Plaintiff
4  must prove that (i) he bought the Gaco Western foam from Defendant; (ii) at the time of purchase,
5  Defendant was in the business of selling the foam; (iii) the Gaco Western foam was not of the
6  same quality as foam generally acceptable in the trade, was not fit for the ordinary purposes for
7  which such foam is used, or did not conform to the quality established by the parties' prior
8  dealings or by usage of trade; (iv) Plaintiff took reasonable steps to notify Defendant within a
9  reasonable time that the Gaco Western foam did not have the expected quality; (v) Plaintiff was
10 harmed; and (vi) the failure of the Gaco Western foam to have the expected quality was a
11 substantial factor in causing Plaintiff's harm.  *See* CACI No. 1231.

12       14.     Plaintiff alleges that the Gaco Western foam was not of merchantable quality
13 because it contained a defect "that resulted in, and continues to result in, premature deterioration
14 in the form of shrinkage, peeling, and other failure when used in a normal, foreseeable and
15 customary way." *See* Compl. ¶¶ 62, 58–64.

16       15.     The Court finds that Defendant is not liable to Plaintiff on his claim of breach of
17 implied warranty of merchantability because Plaintiff did not purchase the foam from Defendant.
18 "Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied
19 warranties of fitness and merchantability."  *United States Roofing, Inc. v. Credit Alliance Corp.*,
20 228 Cal. App. 3d 1431, 1441 (1991).  "A buyer and seller stand in privity if they are in adjoining
21 links of the distribution chain."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir.
22 2008).  Although "particularized exceptions" exist, *see id.*, Plaintiff did not establish that any of
23 them apply.  Performance Foam Tech purchased the foam, not Plaintiff, and there is no evidence
24 that Plaintiff was involved in negotiations or dealings leading to the sale.[14]

---

[14] Plaintiff did, however, establish the other elements of a breach of the implied warranty of merchantability.  There is no dispute that Gaco was in the business of selling foam, and the Court finds that the foam was defective.  The foam installed in Plaintiff's home cracked, pulled away from the wood, and shrank, leaving splits and gaps.  Trial Transcript Excerpts, Volume I at 17:21–19:17.  Internal emails show that Defendant's employees concluded the issue was "a problem with the batch" and that there was a "chemical issue" with the foam.  Ex. 548 at LIT

1          16.     To prevail on a claim for negligence, Plaintiff must prove that (i) Defendant designed, manufactured, supplied, installed, inspected, repaired, or rented the Gaco Western foam; (ii) Defendant was negligent in designing, manufacturing, supplying, installing, inspecting, repairing, or renting the Gaco Western foam; (iii) Plaintiff was harmed; and (iv) Defendant's negligence was a substantial factor in causing Plaintiff's harm. *See* CACI No. 1220.

           17.     Defendant was negligent if it failed to use the amount of care in designing, manufacturing, supplying, inspecting, installing, or repairing the foam that a reasonably careful designer, manufacturer, supplier, installer, or repairer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. In determining whether Defendant used reasonable care, the Court must balance what Defendant knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm. *See* CACI No. 1221.

           18.     Plaintiff alleges that Defendant failed to exercise reasonable care in designing, manufacturing, and marketing the Gaco Western foam. *See* Compl. ¶ 66. Plaintiff alleges Defendant breached its duty to Plaintiff by selling a defective product and failing to take steps necessary to repair and/or discontinue the product. *See id.* ¶¶ 65–71.

           19.     The Court finds Defendant is not liable to Plaintiff on the negligence claim. Plaintiff has submitted no evidence as to the amount of care a reasonably careful manufacturer or supplier would have used to prevent or address the alleged defect. There is nothing in the record that would allow the Court to assess if this defect was a result of Defendant's negligence. *See Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 991 (N.D. Cal. 2014) (granting summary judgment to defendant because plaintiff did not present evidence "regarding what a reasonably careful designer or manufacturer would have done with respect [to the product]").

---

001127. In discussing a potential repair, Defendant's employees acknowledged it was a "foam failure repair." Ex. 551. Defendant appears to have established a $1.37 million reserve to cover claims based on problems with the foam product. *See* Exs. 541, 543. The email chains between Plaintiff and Defendant show that Defendant was on notice of the issue within areasonable time. Finally, Plaintiff provided sufficient evidence of the property damage caused by the defective foam. *See* Feamster Evidence Photos.

13

20. To prevail on a claim for strict products liability, Plaintiff must show that the Gaco Western foam sold by Defendant contained a manufacturing defect, was defectively designed, or did not include sufficient instruction or warning of potential safety hazards. *See* CACI No. 1200.

21. A product contains a manufacturing defect if it differs from the manufacturer's design or specifications or from other typical units of the same product line. *See* CACI No. 1202. For a manufacturing defect, Plaintiff must show that (i) Defendant manufactured, distributed, or sold the Gaco Western foam, (ii) the foam contained a manufacturing defect when it left Defendant's possession, (iii) Plaintiff was harmed; and (iv) the foam's defect was a substantial factor in causing Plaintiff's harm. *See* CACI No. 1201.

22. A product contains a design defect if it does not perform as safely as an ordinary consumer would have expected it to perform. *See id.* No. 1203. To show a design defect, Plaintiff must prove that Defendant manufactured, distributed, or sold the Gaco Western foam; (ii) the foam did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way; (iii) Plaintiff was harmed; and (iv) the failure to perform safely was a substantial factor in causing Plaintiff's harm. *See id.*

23. Plaintiff alleges that Gaco Western's foam products are defective, failed to perform in accordance with his reasonable expectations, and the design benefits of the foam did not outweigh the risk of its failure. *See* Compl. ¶¶ 72–80.

24. The Court finds Defendant not liable to Plaintiff on his design and manufacturing defect claims. A design defect exists when "the product is built in accordance with its intended specifications, but the design itself is inherently defective." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1119 (2002). Plaintiff presented no evidence supporting the claim that the design of the foam was inherently defective. A manufacturing defect exists where a product "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Garrett v. Howmedica Osteonics Corp.*, 214 Cal. App. 4th 173, 190 (2013). Although Plaintiff established that the foam failed, he did not provide any evidence regarding the manufacturing process.

25. To prevail on his unjust enrichment theory, Plaintiff must show (1) Defendant received a benefit and (2) Defendant unjustly retained that benefit at Plaintiff's expense. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021) (citing California law); *see also Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution."). Unjust enrichment is not cognizable when there is a valid and enforceable contract between the parties, as it is an action in quasi-contract. *See Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 998 (N.D. Cal. 2020) (citing California law).

26. Plaintiff alleges that Defendant voluntarily profited and benefited from the purchase of foam products with full awareness that Plaintiff was not receiving foam of the quality, nature, fitness, or value represented by Defendant. Compl. ¶¶ 82–85.

27. The Court finds Defendant not liable on Plaintiff's unjust enrichment theory. Plaintiff has offered no evidence that Defendant was aware that there was an issue with the batch of foam it sold to Performance Foam Tech at the time of sale.

28. "The elements of fraud, which give rise to a tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Golden Gate Way, LLC v. Enercon Servs., Inc.*, 572 F. Supp. 3d 797, 821 (N.D. Cal. 2021) (quoting California law). Unlike affirmative misrepresentations, concealment or nondisclosure are only actionable in four situations: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Id.* (quoting California law).

29. Plaintiff's reliance on the misrepresentation must be actual and reasonable. Plaintiff must show that the misrepresentation or concealment substantially influenced him to purchase the Gaco Western foam, and that he would probably not have bought it otherwise. It is not necessary for the misrepresentation or concealment to be the only reason for Plaintiff's

conduct. *See* CACI No. 1907. For reasonableness, Plaintiff must show that the matter was material, i.e., a reasonable person would find it important in deciding what to do. *See* CACI No. 1908. If the matter was material, then Plaintiff must show it was reasonable to rely on the misrepresentation considering Plaintiff's intelligence, knowledge, education, and experience. *Id.*

30. Plaintiff alleges that Defendant mispresented and concealed material facts about the quality of its foam, and that Defendant had a duty to disclose the actual quality of its foam. Compl. ¶¶ 86–93.

31. The Court finds Defendant not liable on Plaintiff's fraud claim. The record is devoid of evidence that Defendant was aware, at the time of sale, that the foam it sold to Performance Foam Teach was defective. Further, for the reasons explained above, Plaintiff has not established that he relied on any misrepresentations. Regarding concealment, there was no duty to disclose because there was no fiduciary relationship or any evidence that Defendant knew that the quality of the foam was lacking when sold.

32. To prevail on his negligent misrepresentation claim, Plaintiff must show that (i) Defendant represented to Plaintiff that a fact was true; (ii) Defendant's representation was not true; (iii) although Defendant may have honestly believed that the representation was true, Defendant had no reasonable grounds for believing the representation was true when it made it; (iv) Defendant intended that Plaintiff rely on this representation; (v) Plaintiff reasonably relied on Defendant's misrepresentation; (vi) Plaintiff was harmed; and (vii) Plaintiff's reliance on Defendant's misrepresentation was a substantial factor in causing his harm. *See* CACI No. 1903.

33. Like fraud and deceit, Plaintiff must show that his reliance was actual and reasonable. *See* CACI Nos. 1907, 1908.

34. Plaintiff alleges that Defendant negligently misrepresented material facts relating to the quality of its foam product. Compl. ¶ 95.

35. The Court finds Defendant not liable as to Plaintiff's negligent misrepresentation claim. There is no evidence that Defendant made *any* representation regarding the quality of the foam to Plaintiff, let alone without reasonable grounds for believing it was true.

16

**Motion to Amend**

The Court **DENIES** Plaintiff's motion to amend the complaint. *See* Dkt. No. 214. Plaintiff seeks to have his "causes of action conform with material evidence presented during trial" by adding a breach of contract cause of action to his case. *See id.* at 1. Plaintiff brings his motion under Federal Rule of Civil Procedure 15(b)(2). "The purpose of Rule 15(b) is to allow an amendment of the pleadings to bring them in line with the actual issues upon which the case was tried." *Campbell v. Bd. of Trustees of Leland Stanford Junior Univ.*, 817 F.2d 499, 506 (9th Cir. 1987). "An amendment will be proper only if it is found that the parties either expressly or impliedly consented for a trial of the issues not raised in the pleadings." *Id*; *see also Patelco Credit Union v. Sahni*, 262 F.3d 897, 907 (9th Cir.2001).

Plaintiff has not demonstrated that Defendant expressly or impliedly consented to the breach of contract claim. To the contrary, Defendant objects to the addition of that claim. *See* Dkt. Nos. 213, 215. Plaintiff has not demonstrated that Defendant "understood that evidence introduced at trial was introduced to prove a new issue" or that the "new issue was directly addressed and not just inferentially raised by incidental evidence." *In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir. 1994); *see also Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1012–13 (9th Cir. 2004). Plaintiff's proposed breach of contract claim is based on communications with Gaco Vice President of Sales Thomas Sojak after the foam was installed. More specifically, it is based on Plaintiff's own summarizing emails, which constitute inadmissible hearsay. Even if the evidence were admissible, there is no reason for Defendant to have believed the evidence was being introduced to support a breach of contract cause of action. *See Darling Int'l, Inc. v. Baywood Partners, Inc.*, No. C-05-3758 EMC, 2007 WL 2904035, at *1–2 (N.D. Cal. Oct. 2, 2007). Breach of contract was never "directly addressed" and the evidence overlapped with other issues in the case.

The Court also notes that Plaintiff seeks to rely on his own emails from 2016. Plaintiff seeks to amend months after the trial has concluded, based on facts that have been available to him since before he filed this case. And allowing Plaintiff to amend now would be highly prejudicial

to Defendant, which did not defend against a breach of contract claim based on the Sojak communications at trial.

### Conclusion

The Court finds Defendant not liable to Plaintiff on any cause of action. The Court **DENIES** Plaintiff's motion for leave to amend. Dkt. No. 214. The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**IT IS SO ORDERED.**

Dated: 2/21/2023

*Haywood S. Gilliam, Jr.*
HAYWOOD S. GILLIAM, JR.
United States District Judge